UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THEA SWISTARA,

       Plaintiff,

v.                               Case No. 8:21-cv-2767-MAP

COMMISSIONER OF SOCIAL SECURITY

       Defendant.

_____/

## ORDER

Plaintiff seeks judicial review of the denial of her claim for a period of disability and disability insurance benefits (DIB).[1]  Plaintiff argues that the Administrative Law Judge (ALJ) committed reversible error in (1) determining Plaintiff's past relevant work and (2) setting forth the residual functional capacity (RFC) and the corresponding hypothetical to the vocational expert (VE).  As the ALJ's decision was based on substantial evidence and employed proper legal standards, the Commissioner's decision is affirmed.

### I.   Background

Plaintiff, who was born in 1962, claimed disability beginning October 21, 2019 (Tr. 194).  She was 57 years old on the alleged onset date.  Plaintiff obtained a high school education, and her past relevant work experience included work as a security

---

[1]  The parties have consented to my jurisdiction.  *See* 28 U.S.C. § 636(c).

guard supervisor (Tr. 49, 59, 214-15).  Plaintiff alleged disability due to arthritis, depression, insomnia, sleep apnea with use of a CPAP machine, anxiety, nerve damage in her right eye, back spasms, melanoma in remission, and arthritis in her hip, back, and shoulder (Tr. 213).

Given her alleged disability, Plaintiff filed an application for a period of disability and DIB (Tr. 194-95).  The Social Security Administration (SSA) denied Plaintiff's claims both initially and upon reconsideration (Tr. 73-106, 109-19, 132-48).  Plaintiff then requested an administrative hearing (Tr. 164-65).  Per Plaintiff's request, the ALJ held a telephonic hearing at which Plaintiff appeared and testified (Tr. 31-72).  Following the hearing, the ALJ issued an unfavorable decision finding Plaintiff not disabled and accordingly denied Plaintiff's claims for benefits (Tr. 12-30).

In rendering the administrative decision, the ALJ concluded that Plaintiff met the insured status requirements through September 30, 2020, and had not engaged in substantial gainful activity during the period from her alleged onset date of October 21, 2019, through her date last insured of September 30, 2020 (Tr. 17-18).  After conducting a hearing and reviewing the evidence of record, the ALJ determined that Plaintiff had the following severe impairments: lumbar degenerative disc disease, left shoulder osteoarthritis, obstructive airway disease/asthma, and obesity (Tr. 18).  Notwithstanding the noted impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 20).  The ALJ then concluded that, through the date last insured, Plaintiff retained the RFC to

perform light work,[2] except Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could push/pull as much as she could lift/carry; could sit for a period of six hours, stand for a period of six hours, and walk for a period of six hours; was limited to frequent left overhead reach; could frequently balance; could occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; was limited to frequent exposure to unprotected heights, moving mechanical parts, and vibration; and was limited to frequent exposure to dust, odors,[3] fumes, pulmonary irritants, and extreme cold (Tr. 20).   In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence (Tr. 22).   Considering Plaintiff's noted impairments and the assessment of a VE, the ALJ determined that Plaintiff could perform her past relevant work as a security guard, both as the job was

---

[2]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

[3]  In the decision, the ALJ limited Plaintiff to frequent exposure to "orders" rather than "odors" (Tr. 20).   As the term "orders" appears in a list of identified environmental limitations, it seems that the ALJ made a scrivener's error and intended to limit Plaintiff's exposure to odors not orders.

generally performed in the national economy and as Plaintiff actually performed it (Tr. 24, 57-71).   Accordingly, based on Plaintiff's age, education, work experience, RFC, and the testimony of the VE, the ALJ found Plaintiff not disabled at any time from October 21, 2019, the alleged onset date, through September 30, 2020, the date last insured (Tr. 25).   Given the ALJ's finding, Plaintiff requested review from the Appeals Council, which the Appeals Council denied (Tr. 1-11, 187-90).   Plaintiff then timely filed a complaint with this Court (Doc. 1).   The case is now ripe for review under 42 U.S.C. § 405(g).

II.     *Standard of Review*

To be entitled to benefits, a claimant must be disabled, meaning the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(A).   A "physical or mental impairment" is an "impairment that results from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. § 423(d)(3).

To regularize the adjudicative process, the SSA promulgated the detailed regulations currently in effect.   These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled.   20 C.F.R. § 404.1520.   If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary.   20 C.F.R. § 404.1520(a).   Under this process, the ALJ must determine,

in sequence, the following:  whether the claimant is currently engaged in substantial gainful activity; whether the claimant has a severe impairment, *i.e.*, one that significantly limits the ability to perform work-related functions; whether the severe impairment meets or equals the medical criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1; and whether the claimant can perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4).  If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do other work in the national economy in view of his or her age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  A claimant is entitled to benefits only if unable to perform other work.  *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. § 404.1520(g)(1).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards.  *See* 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation and internal quotation marks omitted).  While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (citations omitted).

In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its own judgment for that of the ALJ, even if it finds that the

evidence preponderates against the ALJ's decision. *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014); *Winschel*, 631 F.3d at 1178 (citations omitted); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis, mandates reversal. *Ingram*, 496 F.3d at 1260 (citation omitted). The scope of review is thus limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002) (*per curiam*) (citations omitted).

III.   *Discussion*

A.   *Past Relevant Work*

Plaintiff first argues that the ALJ erred in determining Plaintiff's past relevant work as a security guard. Plaintiff contends that an apparent conflict exists between the VE's testimony and the job description set forth in the Dictionary of Occupational Titles (DOT). Specifically, Plaintiff asserts that the tasks Plaintiff performed in her past work is inconsistent with the job description of a security guard and instead more closely aligns with the job description of an airline security representative. *Compare* DOT § 372.667-034 (security guard) *with* DOT § 372.667-010 (airline security representative).

At step four of the sequential evaluation process, the ALJ assesses the claimant's RFC and ability to perform past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545. A claimant bears the burden of proving that his or her impairments prevent

him or her from performing past relevant work. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). To determine a claimant's past relevant work experience, the ALJ considers work done within the last 15 years that lasted long enough for the claimant to learn to do it and that qualified as substantial gainful activity. 20 C.F.R. §§ 404.1560(b)(1), 404.1565(a); Social Security Ruling (SSR) 82-62, 1982 WL 31386, at *1 (1982). In considering a claimant's past relevant work, "[t]he regulations require that the claimant not be able to perform his past *kind* of work, not that he merely be unable to perform a specific job he held in the past." *Jackson v. Bowen*, 801 F.2d 1291, 1293 (11th Cir. 1986) (emphasis in original; citations omitted). Accordingly, a claimant needs to demonstrate that he or she cannot return to his or her former *type* of work rather than to a specific prior job. *Id.* (citations omitted).

To assist in determining a claimant's ability to perform her past relevant work, the ALJ may use the services of a VE or other resources, such as the DOT and its companion volumes and supplements. 20 C.F.R. § 404.1560(b)(2). The VE may offer relevant evidence within his or her expertise or knowledge regarding the physical and mental demands of a claimant's past relevant work, either as actually performed by the claimant or as generally performed in the national economy, which may prove helpful in supplementing or evaluating the accuracy of the claimant's description of the past relevant work. 20 C.F.R. § 404.1560(b)(2); *cf. Bryant v. Comm'r of Soc. Sec.*, 451 F. App'x 838, 839 (11th Cir. 2012) (noting that the regulations provide that an ALJ

may rely upon a VE's knowledge or expertise).[4]  The VE may also provide expert opinion testimony in response to a hypothetical question posed by the ALJ about whether a person with the physical and mental limitations imposed by the claimant's limitations can meet the demands of the claimant's previous work, either as actually or generally performed.  20 C.F.R. § 404.1560(b)(2).

Here, in her application, Plaintiff identified her only past job title in the prior 15 years as that of a "Security guard supervisor" at a cruise ship security check-in (Tr. 215).  She described the position as scanning bags and people before they entered the cruise ship (Tr. 215).  According to Plaintiff, the job required her to use machines, tools, or equipment; use technical knowledge or skills; and write, complete reports, and perform other similar duties (Tr. 215).  Regarding the tasks required to perform the job, Plaintiff indicated that she would walk for one hour, stand for four hours, sit for four hours, stoop for one hour, kneel for one hour, crouch for two hours, reach for 30 minutes, and write, type, or handle small objects for 30 minutes (Tr. 215).  The job did not require any crawling or handling of large objects but did require Plaintiff to move luggage on a belt and frequently lift less than 10 pounds (Tr. 215).  Lastly, in performing the job, Plaintiff operated as a lead worker, supervising 15 people all day (Tr. 215).

Subsequently, both Plaintiff's counsel and the ALJ addressed Plaintiff's past work during the administrative hearing.  Initially, Plaintiff's counsel presented an

---

[4]  Unpublished opinions are not considered binding precedent but may be cited as persuasive authority.  11th Cir. R. 36-2.

opening statement, during which he explicitly stated: "So, it appears her past relevant work that she did, you know, security guard work, that appears to be a light occupation" (Tr. 38-39).   Following counsel's opening statement, Plaintiff's counsel questioned Plaintiff regarding the job requirements of her security guard position and inquired as to whether Plaintiff performed any other work "besides the security guard work," to which Plaintiff responded that she had not (Tr. 41-43).   Plaintiff stated that she worked as a supervisor for her last four years and worked as a normal security screener screening luggage prior to that (Tr. 57).   In describing her job requirements, Plaintiff indicated that she was a supervisor walking around and making sure that all the other employees under her supervision "were doing what they should be doing," but she also moved suitcases around and searched suitcases if a screener found something suspicious, which happened about three to four times per day, and then relieved people from their post if they needed a break and performed "pat-downs and wanding of people" (Tr. 41-43, 56-57).   Her typical workday lasted 11 hours, with approximately nine hours spent walking around checking on other posts, although she could sit and rest and then walk around if needed (Tr. 42-43).   Additionally, along with her supervisor, she would hire and fire people and perform scheduling for everyone (Tr. 41-42).

Later in the administrative hearing, the ALJ asked the VE to describe Plaintiff's past work (Tr. 59).   In response, the VE stated that Plaintiff's job appeared to be that of a working supervisor but that the DOT codes for the security supervisor and security guard positions were the same, so the VE classified Plaintiff's past work as that of a

security guard, DOT § 372.667-034 (Tr. 59).  The ALJ then posed hypotheticals to the VE, asking only whether such hypothetical individuals could perform Plaintiff's past work, given Plaintiff's advanced age (Tr. 60-70).  In response to the first hypothetical, which incorporated the noted RFC limitations, the VE testified in the affirmative, stating that Plaintiff could perform her past work with those limitations (Tr. 59-60).

Against that backdrop, Plaintiff now argues that an apparent conflict exists between (1) the tasks Plaintiff performed in her past work and the VE's testimony regarding Plaintiff's past work and (2) the DOT's job description of a security guard. *See* DOT § 372.667-034 (security guard).  As noted, Plaintiff believes that her prior work more closely aligns with the job description of an airline security representative. *See* DOT § 372.667-010 (airline security representative).  Based on this purported misclassification of her past relevant work, she contends that the matter should be remanded to the ALJ to resolve any potential conflicts between the VE's testimony and the DOT to address whether Plaintiff's past relevant work was that of a security representative or that of a security guard and, once that issue is resolved, to determine whether Plaintiff could perform her past relevant work.

In *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353 (11th Cir. 2018), the Eleventh Circuit discussed the ALJ's duty under SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000), to resolve conflicts between the DOT and VE evidence.  In doing so, the Eleventh Circuit indicated:

> After careful review, we conclude that, pursuant to the terms of the Ruling, and in light of the overall regulatory scheme that governs disability claims, the ALJs within the SSA have an affirmative duty to

identify apparent conflicts between the testimony of a Vocational Expert and the DOT and resolve them. This duty requires more of the ALJ than simply asking the VE whether his testimony is consistent with the DOT. Once the conflict has been identified, the Ruling requires the ALJ to offer a reasonable explanation for the discrepancy, and detail in his decision how he has resolved the conflict. The failure to discharge this duty means that the ALJ's decision, when based on the contradicted VE testimony, is not supported by substantial evidence.

*Washington*, 906 F.3d at 1356. An "apparent conflict" means a conflict "reasonably ascertainable or evident from a review of the DOT and the VE's testimony." *Id.* at 1365. "At a minimum, a conflict is apparent if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out to not be the case." *Id.*

Review of the DOT job descriptions at issue in this case reveals that no apparent conflict exists which would warrant remand. As an initial matter, the DOT indicates that the industry designation for the airline security representative is the "air transportation industry" and describes the job of an airline security representative as follows:

Screens passengers and visitors for weapons, explosives, or other forbidden articles to prevent articles from being carried into restricted area of air terminal, performing any combination of following tasks: Greets individuals desiring to enter restricted area and informs them that they must be screened prior to entry. Asks individual to empty contents of pockets into tray. Examines contents of tray for forbidden articles and directs individual to pass through metal-detecting device. Asks individual to remove metal articles from person if metal detector signals presence of metal, or uses hand[-]held metal detector to locate metal item on person. Places carry-on baggage or other containers onto x-ray device, actuates device controls, and monitors screen to detect forbidden articles. Requests owner to open baggage or containers when x[-]ray shows questionable contents. Returns baggage and tray contents to individual if no forbidden articles are detected. Notifies GUARD, SECURITY (any

industry) if forbidden articles are discovered or detector equipment indicates further search is needed. May turn on power and make adjustments to equipment. May perform duties of GUARD, SECURITY (any industry). May screen boarding passengers against Federal Aviation Administration approved profile of aircraft hijackers. May make reports.

DOT § 372.667-010, 1991 WL 673094.  Regarding the security guard, the DOT

indicates that the security guard can operate in "any industry" and describes the job as

follows:

Guards industrial or commercial property against fire, theft, vandalism, and illegal entry, performing any combination of following duties: Patrols, periodically, buildings and grounds of industrial plant or commercial establishment, docks, logging camp area, or work site. Examines doors, windows, and gates to determine that they are secure. Warns violators of rule infractions, such as loitering, smoking, or carrying forbidden articles, and apprehends or expels miscreants. Inspects equipment and machinery to ascertain if tampering has occurred. Watches for and reports irregularities, such as fire hazards, leaking water pipes, and security doors left unlocked. Observes departing personnel to guard against theft of company property. Sounds alarm or calls police or fire department by telephone in case of fire or presence of unauthorized persons. Permits authorized persons to enter property. May register at watch stations to record time of inspection trips. May record data, such as property damage, unusual occurrences, and malfunctioning of machinery or equipment, for use of supervisory staff. May perform janitorial duties and set thermostatic controls to maintain specified temperature in buildings or cold storage rooms. May tend furnace or boiler. May be deputized to arrest trespassers. May regulate vehicle and pedestrian traffic at plant entrance to maintain orderly flow. May patrol site with guard dog on leash. May watch for fires and be designated Fire Patroller (logging). May be designated according to shift worked as Day Guard (any industry); area guarded as Dock Guard (any industry); Warehouse Guard (any industry); or property guarded as Powder Guard (construction). May be designated according to establishment guarded as Grounds Guard, Arboretum (any industry); Guard, Museum (museums); Watchguard, Racetrack (amuse. & rec.); or duty station as Coin-Vault Guard (any industry). May be designated Guard, Convoy (any industry) when accompanying or leading truck convoy carrying valuable shipments. May be designated: Armed Guard

> (r.r. trans.); Camp Guard (any industry); Deck Guard (fishing & hunt.; water trans.); Night Guard (any industry); Park Guard (amuse. & rec.).

DOT § 372.667-034, 1991 WL 673100. As the job descriptions indicate, the security representative notifies the security guard if forbidden articles are discovered or detector equipment indicates further search is needed, meaning that in her supervisory position, as she described it, Plaintiff's job duties more closely resembled that of the security guard than the security representative with respect to the screening and review of forbidden articles. The security guard job duties also encompass several of the tasks Plaintiff described, including patrolling and guarding buildings and docks; warning violators of rule infractions, including carrying forbidden articles; permitting authorized persons to enter property; and recording data. Given these descriptions, no apparent conflict existed between the DOT and the VE's testimony as to Plaintiff's past relevant work as a security guard, which falls under the same classification as a security guard supervisor.

Indeed, as the record reflects, Plaintiff identified her past relevant work as a security guard supervisor in her application (Tr. 215). Later, during the administrative hearing, Plaintiff's counsel stated, unprompted, that Plaintiff's past work constituted "security guard work" (Tr. 38-39). During the same administrative hearing, the ALJ asked the VE to identify Plaintiff's past relevant work, and the VE explained that Plaintiff's past relevant work appeared to be as a working supervisor but that the DOT codes for the security supervisor and security guard positions were the same and thus classified Plaintiff's past work as security guard (Tr. 59). Importantly, as the

Commissioner notes, though afforded an opportunity during the administrative hearing to question the VE regarding Plaintiff's past relevant work, Plaintiff's counsel did not inquire as to any other classifications of past relevant work nor challenged the VE's testimony regarding the classification of Plaintiff's past relevant work (Tr. 63-71).

Regardless, the ALJ did not need to resolve any apparent conflict between the VE's testimony and the DOT, as none existed.  Rather, the ALJ properly relied upon the VE's testimony regarding Plaintiff's past relevant work as a security guard and, as discussed more fully below, Plaintiff's ability to perform such past relevant work, both as generally and actually performed.  Remand therefore is not warranted on that issue.

### B.      RFC and Hypothetical

Plaintiff's second point of contention involves the ALJ's RFC determination and corresponding hypothetical posed to the VE.  Namely, Plaintiff contends that the standing and walking limitations set forth in the RFC and the hypothetical to the VE did not fully account for Plaintiff's limitations as they did not address how long Plaintiff could stand or walk at one time.  Given such alleged deficiency, Plaintiff argues that the ALJ posed an incomplete hypothetical to the VE, and thus the VE's testimony does not constitute substantial evidence, thereby warranting remand.

As indicated above, at step four of the sequential evaluation process, the ALJ assesses the claimant's RFC and ability to perform past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545.  To determine a claimant's RFC, an ALJ makes an assessment based on all the relevant evidence of record as to what a claimant can do in a work setting despite any physical or mental limitations caused by the claimant's

impairments and related symptoms.  20 C.F.R. § 404.1545(a)(1).  In rendering the RFC, therefore, the ALJ must consider the medical opinions in conjunction with all the other evidence of record and will consider all the medically determinable impairments, including impairments that are not severe, and the total limiting effects of each.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(2) & (e); *see Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) (stating that the "ALJ must consider the applicant's medical condition taken as a whole").  In doing so, the ALJ considers evidence such as the claimant's medical history; medical signs and laboratory findings; medical source statements; daily activities; evidence from attempts to work; lay evidence; recorded observations; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects of any medication or other treatment the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures the claimant uses or has used to relieve pain or symptoms; and any other factors concerning the claimant's functional limitations and restrictions.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 404.1545(a)(3); SSR 96-8p, 1996 WL 374184 (July 2, 1996); SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).

Thereafter, at step five, the Commissioner must consider the assessment of the RFC combined with the claimant's age, education, and work experience to determine whether the claimant can make an adjustment to other work.  *Phillips v. Barnhart*, 357 F.3d 1232, 1239 (11th Cir. 2004), *superseded by regulation on other grounds*, 20 C.F.R. § 404.1520c, *as stated in Jones v. Soc. Sec. Admin.*, No. 22-10507, 2022 WL 3448090, at *1

(11th Cir. Aug. 17, 2022); 20 C.F.R. § 404.1520(a)(4)(v).  If the claimant can make an adjustment to other work, a finding of not disabled is warranted.  *Phillips*, 357 F.3d at 1239.  Conversely, if the claimant cannot make an adjustment to other work, a finding of disabled is warranted.  *Id.*  At this step, the burden temporarily shifts to the Commissioner to show other jobs exist in significant numbers in the national economy which, given the claimant's impairments, the claimant can perform.  *See Washington*, 906 F.3d at 1359 (citation omitted); *see Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995); 20 C.F.R. § 404.1520(a)(4)(v). "The ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture." *Wilson*, 284 F.3d at 1227 (citation omitted).  There are two avenues by which an ALJ may determine a claimant's ability to adjust to other work in the national economy; namely, by applying the Medical Vocational Guidelines ("Grids") and by using a VE.  *Phillips*, 357 F.3d at 1239-40.  Typically, where the claimant cannot perform a full range of work at a given level of exertion or where the claimant has non-exertional impairments that significantly limit basic work skills, the ALJ should consult a VE.  *Id.* at 1242.  For a VE's testimony to constitute substantial evidence, however, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.  *Wilson*, 284 F.3d at 1227.  As the Commissioner contends, the ALJ may rely upon a VE's knowledge or expertise. *Bryant*, 451 F. App'x at 839; *see* 20 C.F.R. § 404.1560(b)(2).

In this instance, the ALJ determined that Plaintiff retained the RFC to perform a reduced range of light work – including limitations to sit for a period of six hours,

stand for a period of six hours, and walk for a period of six hours – and posed a hypothetical to the VE with the corresponding limitations (Tr. 20-24, 59-63). Plaintiff contends that the ALJ should have accounted for her inability to remain on her feet, either walking or standing, for long periods of time and her need to sit periodically during shifts. In support of her contention, Plaintiff points to her testimony and statements to her medical practitioners, where she reported that she experienced extreme pain and difficulties standing or walking for long periods (Tr. 42-45, 557, 579-80). Namely, during the administrative hearing, Plaintiff testified that her typical workday lasted 11 hours and that she would have to walk around and check posts for approximately nine hours of each day (Tr. 43). At the same time, she indicated that, in performing her duties, she "got away with sitting a while" such that she could sit and rest and then walk around (Tr. 42). Then, in describing her ability to walk in general, she stated that she could only walk for about five minutes before requiring rest due to shooting pain from her back down her leg and could only sit for about 15 minutes at a time (Tr. 44-45). In the decision, the ALJ acknowledged Plaintiff's testimony regarding her symptoms and limitations but found, based on review of the evidence of record, that, although Plaintiff had medically determinable impairments that could reasonably be expected to cause her alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record (Tr. 22).

Indeed, as discussed by the ALJ, the evidence of record showed that Plaintiff suffered from several impairments, but the record simply did not support Plaintiff's extreme limitations regarding her ability to sit, stand, and walk (Tr. 15-24).  For example, plaintiff presented to Dr. Tien Le, a neurological spine surgeon, in May 2020 upon referral from Dr. Richard Cain (Tr. 554-56).  Plaintiff presented to Dr. Le with buttock pain and bilateral leg pain, with the pain starting at the sacrum and radiating into her buttock and hips bilaterally and extending through the lateral legs (Tr. 554).  Plaintiff reported that her pain was aggravated when standing, she found relief when lying down, her pain registered as a six out of 10 that day, and her pain was sharp, dull, and aching, although she denied any back pain, focal weakness, or numbness (Tr. 554).  Upon examination, however, Dr. Le noted that Plaintiff showed full range of motion with active flexion, extension, lateral  rotation, and lateral bending of the cervical spine; normal range of motion and no thoracic kyphosis, scoliosis, or deformity of the thoracic spine; normal lordosis and range of motion with no scoliosis or deformity of the lumbar spine; muscle tone and bulk within normal limits; normal gait and station; ambulation without an assistive device; hips, knees, and ankles with full range of motion without tenderness to palpation of those joints; intact sensation to light touch and pinprick; and normal coordination in the upper and lower extremities (Tr. 555).  Dr. Le did not recommend acute neurosurgical intervention at that time but ordered a pelvic MRI to determine the cause of her coccygeal pain (Tr. 556).  The next month, despite reporting sharp, dull, and aching pain across her sacral region with radiation into her buttocks, hips, and legs that worsened upon standing and rating her

pain as an eight out of 10 to Dr. Le, Plaintiff showed no focal deficits on examination, Plaintiff's MRI of the pelvis was unremarkable, and Plaintiff was initiated on non-operative management with physical therapy for core and back strengthening and given a referral for consideration of epidural steroid injections (Tr. 22-23, 557).[5]

At the same time, Plaintiff sought treatment from Dr. Cain for her back, hip, shoulder, and right knee (Tr. 22-23, 329-42, 590-604). As the ALJ indicated, Plaintiff expressed that she was experiencing severe back pain, but she showed only lumbar tenderness and a negative straight leg raise in December 2019, so Dr. Cain provided Plaintiff with a Medrol Dosepak and a prescription for physical therapy (Tr. 594-95). Similarly, as the ALJ discussed, diagnostic testing and treatment notes from February 2020 further supported the ALJ's finding that, while Plaintiff demonstrated impairments, such impairments were not as limiting as alleged. Initially, a February 2020 lumbar spine X-ray showed that Plaintiff suffered from mild diffuse changes of lumbar degenerative spondylosis, moderate disc height loss at L5-S1, mild disc height loss at L3-4 and L4-5, and minimal retrolisthesis on L4 and L5 (Tr. 23, 438-39). Later that month, Plaintiff presented for a consultative examination with Dr. Sheyar Amin, reporting arthritis in her shoulder, hip, back, and leg and problems with her back and neck (Tr. 23, 456-65). Plaintiff described her issues as stemming from a prior car

---

[5] Dr. Le noted that Plaintiff's April 2020 MRI demonstrated left paracentral disc herniation at L5-S1 (Tr. 557). Review of the MRI indicates that Plaintiff showed bilateral facet arthropathy with resultant bilateral foraminal stenosis but no evidence of disc herniation or central stenosis at L5-S1 (Tr. 558). The MRI also revealed bilateral foraminal stenosis at L4-5 (Tr. 558).

accident with symptoms worsening over the years and including current symptoms of constant pain, trouble walking, immobility, weakness, swelling, sharp pains, and back spasms and reported that all her symptoms were better with medication but that her symptoms worsened with sitting and standing any length of time (Tr. 456, 459-60). She reported that she could only sit for 20 minutes, stand for 20 minutes, and walk 25 yards due to back pain (Tr. 457). Notwithstanding Plaintiff's statements, Dr. Amin documented almost completely unremarkable findings, including a symmetric, steady gait; no use of an assistive device; no palpable muscle spasms; full muscle strength in the upper and lower extremities bilaterally; intact sensation throughout; negative bilateral straight leg test; no joint swelling, erythema, effusion, tenderness, or deformity; an ability to lift, carry, and handle objects; an ability to perform fine motor skills; an ability to squat and rise from that position with moderate difficulty; an ability to rise from a sitting position without assistance; no difficulty getting up and down from the exam table; an ability to walk on heels and toes; normal tandem walking; an ability to stand but not hop on one foot bilaterally; and full range of motion within normal limits except for hip flexion and abduction on the left side (Tr. 458-64). Following the examination, Dr. Amin made the following observations:

> The patient reports that her main complaint is left hip pain with walking. The patient reports that this has been progressively getting worse over the past 4 years. She reports that her issues initially started after a car accident that happened 30 years ago and then subsided; however, over the years and more recently, her pain symptoms are starting to flare up. She reports that around 5 years ago while walking at work, she noticed severe left hip pain and her leg gave way and she fell. She was unable to walk. She has since then follow[ed] with doctors and was diagnosed with osteoarthritis, which she has been manag[ing] conservatively and she has

not had any arthroplasty.  The patient reports constant pain that causes her trouble walking; however, on my examination, the patient was sitting up in bed and appeared very comfortable with her legs crossed under her. Both hips and knees flexed and sitting with her legs underneath her and did not appear uncomfortable or having any pain, so I am not entirely sure how severe her hip condition is, but she does appear normal on my examination.  Her range of motion is normal[,] and her strength exam is normal.  Additionally, she reports that for the past 5 years, she has had worsening of her lower back pain and she reports that she has degenerative disc disease, there are no supporting records.  She reports sharp pain in her lower back[,] and she feels muscle spasms occasionally in her back.  This pain does not radiate to her lower extremities[,] and she is currently taking OxyContin for hip and back pain and reports that it gets rid of the pain.  The patient's main issue is that she feels that her pain is limiting her from working and being outside the house as she has difficulty walking[,] and this has caused worsening of her depression and she feels she is homebound from this.  On my examination, there is no objective finding to suggest significant pathology[,] and she appeared comfortable with stating that she has pain; however, she was able to move her hips within the full range of motion without any signs of pain. I did not feel that this is disabling for her.

(Tr. 459-60).

Plaintiff then returned to Dr. Cain in April 2020, complaining of worsening low back pain that led to her quitting her job due to the pain, which she indicated was worse when she stood but was also present at rest, localized with only occasional radiation, and did not include numbness or tingling (Tr. 22-23, 597).  Plaintiff stated that physical therapy did not help but that she took Tylenol and Oxycodone she had "laying around" that helped with her pain (Tr. 597).  Upon examination, Dr. Cain noted that Plaintiff ambulated without an assistive device and that her lumbar spine demonstrated no outward deformity even though she showed paraspinal muscular tenderness to palpation, limited lumbar extension, pain with lateral flexion bilaterally, and positive straight leg raise test (Tr. 597-98).  Given the perceived progression of

pain and lack of alleviation of symptoms through physical therapy and other conservative treatments, Dr. Cain ordered the April MRI of the lumbar spine and referred Plaintiff to Dr. Le (Tr. 598).  As indicated, the only abnormal findings on the April MRI were bilateral foraminal stenosis at L4-5 and L5-S1 and bilateral facet arthropathy at L5-S1 (Tr. 603-04).

Later, in August 2020, Plaintiff presented to Dr. Neil Weisman for diagnostic bilateral lumbosacral facet joint medial branch nerve block injection for medial branch nerves L2-L5 (Tr. 23, 500-05).  Plaintiff indicated 100% relief of axial lower back pain following the procedure, which was sustained, but also reported a return of some of the left radicular pain that had previously been relieved (Tr. 500).  Plaintiff had been utilizing Gabapentin with good tolerability and some additional analgesic effect (Tr. 500).  At that time, Plaintiff reported only sharp, intermittent pain radiating to the left leg that was improving but reported no muscle aches, no muscle weakness, no arthralgias or joint pain, and no swelling in the extremities (Tr. 502).

Based on the foregoing and the other evidence of record cited, the ALJ properly concluded that Plaintiff could perform the reduced range of light work with the corresponding standing, sitting, and walking limitations.  While Plaintiff points to a couple records to support her position, such as the notes and opinion from Dr. Joey Ancheta following an independent medical evaluation (Tr. 579-83), the issue before the Court is whether substantial evidence supports the ALJ's decision, even if the evidence preponderates against the decision, not whether some evidence may support Plaintiff's claim.  *See Mitchell*, 771 F.3d at 782; *Winschel*, 631 F.3d at 1178 (citations

omitted); *Bloodsworth*, 703 F.2d at 1239.  Here, the ALJ relied upon substantial evidence in correctly determining that Plaintiff maintained the ability to perform the reduced range of light work set forth in the RFC assessment (Tr. 20-24).  Accordingly, in setting forth the hypothetical to the VE, the ALJ appropriately incorporated the limitations set forth in that RFC assessment.  As the hypothetical to the VE comprised all of Plaintiff's impairments and limitations, the VE's testimony constituted substantial evidence upon which the ALJ could rely in determining that Plaintiff maintained the ability to perform her past relevant work as a security guard as both actually and generally performed.  *See Wilson*, 284 F.3d at 1227.  For the foregoing reasons, therefore, the ALJ applied the correct legal standards, and the ALJ's decision is supported by substantial evidence.

IV.    *Conclusion*

After consideration, it is hereby

ORDERED:

1.    The decision of the Commissioner is affirmed.

2.    The Clerk is directed to enter final judgment in favor of the Commissioner and close the case.

DONE AND ORDERED in Tampa, Florida, on this 28th day of December, 2022.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

cc:     Counsel of Record